UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

                                                    Case No. 24-cr-28-pp

        v.

QUIAN COLLINS,

                    Defendant.

**ORDER DENYING MOTION FOR DISTRICT COURT REVIEW OF
DETENTION ORDER (DKT. NO. 112)**

        On February 12, 2024, Magistrate Judge Stephen C. Dries ordered the
defendant detained pending trial. Dkt. Nos. 38, 39. On August 20, 2024, the
defendant filed a Motion for District Court Review of Detention Order, dkt. no.
112, to which the government has responded, dkt. no. 114.

        After conducting a *de novo* review of the record and the parties'
arguments, the court concludes that the defendant has rebutted the two
presumptions of detention but that the government has satisfied its burden to
prove by clear and convincing evidence that the defendant poses a danger to
the community and that there is no condition or combination of conditions that
will assure the safety of others or the community. The court will deny the
defendant's motion for review of the detention order.

**I.      Background**

        The government explains that in July 2022, various federal and local law
enforcement agencies began investigating a drug trafficking organization (DTO);
a confidential source and/or an undercover agent engaged in multiple

1

controlled buys between July 2022 and March 2023 and the undercover agent obtained some twenty firearms, including "ghost" guns (untraceable guns) and auto-sear switches (or guns with an affixed switch). Dkt. No. 114 at 1-2. The investigation ended when one of the suspected DTO members murdered another. Id. at 2. A third DTO member was arrested in the spring of 2023 related to the homicide, leading to federal charges against several members of the organization (including Dontrell Franklin, the person alleged to have committed the homicide). Id. These charges led to another set of federal charges; as the investigations continued, the cell phone of the homicide victim (Daniel Rodriguez-Perez) was found to contain the defendant's cell phone number. Id. The phone records showed that the defendant and Rodriguez-Perez had exchanged 92 telephone calls between February 2 and March 9, 2023. Id. Attention began to turn to the defendant and his associates.

During the investigations, agents met with several confidential sources. CI1 advised agents that he understood the defendant to be the cousin of Dontrell Franklin, the DTO member who allegedly had murdered Rodriguez-Perez. Id. at 3. CI1 told the agents that after Franklin was arrested, the defendant and other DTO members had pooled their money to post Franklin's bail, and that after Franklin was arrested, the defendant began obtaining drugs from Rodriguez-Perez. Id. CI1 stated that after Franklin was released from custody, the defendant told Franklin that he needed to "lay low." Id. CI2 engaged in drug trafficking with Franklin and Rodriguez-Perez, and told law enforcement that Franklin and the defendant sold controlled substances to each other. Id. CI2 said that the defendant sometimes provided drugs to Rodriguez-Perez and Franklin and that the defendant had bought one kilogram of drugs from Rodriguez-Perez and Franklin in early 2022. Id. CI2 alleged that

the defendant had begun dealing directly with Rodriguez-Perez after Franklin was arrested and had traveled with Rodriguez-Perez to Texas in January 2023 to meet Rodriguez-Perez's source, buying at least one kilogram of drugs on the trip. Id. CI3 provided similar information, saying that the defendant was Franklin's original source of supply, starting at 5-10 grams of heroin per month and increasing to 100 grams per month. Id. at 4. CI3 said that the defendant also sold ounces of cocaine to Franklin. Id. CS3 said, however, that once Franklin met Rodriguez-Perez, *Franklin* began to sell kilograms of heroin, fentanyl and cocaine to the *defendant.* Id. CI3 said that in the fall of 2022, the defendant began to obtain drugs directly from the "Mexicans," and that in August 2022 the defendant had contributed $3,000 to help bail Franklin out of jail. Id. CI3 identified individuals who helped the defendant sell drugs, as well as one individual to whom the defendant had sold drugs. Id. CI4 provided information about a drug dealer named "Loco," whose phone was in contact with the defendant's 107 times between February 2, 2023 and March 28, 2023. Id.

On two occasions, the defendant distributed fentanyl to an undercover officer. Id. at 5.

On February 2, 2024, the government filed a complaint alleging that the defendant and eight others had committed various drug offenses. Dkt. No. 1. The same day, the court issued arrest warrants for all the defendants.

On February 7, 2024, during search warrants conducted at several residences, "case agents seized hundreds of grams of heroin and cocaine, as well as fentanyl and methamphetamine; 15 firearms; a machinegun conversion device; a ballistic vest; numerous magazines and ammunition; and over $100,000." Dkt. No. 114 at 5-6.

Inside the defendant's residence, case agents located items consistent with his large-scale fentanyl, cocaine, and methamphetamine drug trafficking. For example, case agents located men's pants with a large amount of cash throughout the numerous pockets; 13.34 grams of fentanyl, heroin, cocaine; and 6.714 grams of cocaine base. []

In total, at Collins' residence, case agents located 21.694 grams cocaine; 19.356 grams of fentanyl, heroin, and cocaine; and 1.227 grams of cocaine and methamphetamine. Case agents also located a loaded Palmetto State Armory Semi-Auto rifle, .380, bearing serial number PF073779 []; a loaded Smith and Wesson M&P Shield .380 caliber handgun with the serial number removed []; rounds of ammunition for Winchester 22 Rifle and Remington .380; rifle magazines; $80,700 cash found throughout the residence and in amounts consistent with drug trafficking [].

Case agents also located items consistent with large scale fentanyl and cocaine trafficking such as multiple cell phones []; vacuum sealers []; multiple scales and blenders []; N-95 mask (used when mixing controlled substances for protection) lactose (which is used for cutting heroin and fentanyl) []; multiple baggies including a kilogram size wrapping and baggies with controlled substances []; glass measuring with controlled substances inside (commonly used for cooking cocaine into "crack" cocaine) []; and a pill press [].

Case agents also found items connecting the defendant to a Milwaukee based street gang, "3278". This included a bear paw pendant, which the defendant also displayed on social media []; Cartier glasses []; and "3278" pendant. [].

Id. at 6-7.

The government says that the defendant's phone "is filled with drug trafficking communication and is consistent with CIs information." Id. at 8. It recounts multiple text messages between the defendant and Franklin, Rodriguez-Perez and co-defendants in this case regarding controlled substances. Id. at 8-10. Some of the text messages contained photos and video supporting the conclusion that the defendant was involved in drug dealing and possessed guns.

4

The defendant and seven others were arrested on February 7, 2024. At a hearing that afternoon, Judge Dries recounted that the potential charges included a mandatory minimum sentences; he ordered the defendant temporarily detained and scheduled a detention hearing. Dkt. Nos. 3, 4. Before the detention hearing, Pretrial Services prepared a bond study. Dkt. No. 19. The report does not reflect the defendant's age (although, from the dates of his arrests and his ages at the times of those arrests, it appears that he is about thirty), but recounts that he was born in Milwaukee. Id. at 1. The defendant reported that he did not know his father, but that he had a good relationship, and daily contact, with his mother, who lives in Milwaukee. Id. He has four siblings (two brothers and two sisters); his two brothers—Shannon Wilder and Kevin Winston—are co-defendants in this case. Id. The defendant reported a relationship with Briana Madden and five minor children from prior relationships; he planned to live with Madden and her sister if released. Id. at 1-2.

The defendant reported that he did not have a high school diploma or a GED; he completed the tenth grade. Id. at 2. He reported being unemployed but said that he earned about $1,600 a month helping in his family's store and selling things on Facebook Marketplace. He also reported being financially supported by his girlfriend. Id. The defendant reported being in good health, other than occasional pain in his forearm from being shot in 2011. Id. at 3. He reported no mental health problems, but said that he used THC daily, heroin weekly and prescription opiates (Percocet) weekly; he said he'd last used the opiate a month prior to his arrest. Id.

Pretrial Services' record check showed that the defendant's criminal history dates back to 2008, when he was fourteen. Id. From ages fourteen

through sixteen, he had three juvenile referrals: disorderly conduct, possession of a dangerous weapon by a person under the age of eighteen and armed robbery/pointing a firearm at law enforcement. Id. at 3-4. Although he was convicted in 2011 of possession with intent to deliver marijuana, that conviction was expunged. Id. at 4. His adult convictions included misdemeanor possession of an illegally obtained prescription (he was placed on probation, but that probation was revoked) and manufacturing/delivering heroin and possession of heroin with intent to distribute (for which he received a sentence of three years in prison). Id. at 4-5.

Pretrial Services concluded that the defendant posed a risk of non-appearance because he had no verifiable, legitimate employment, and that he posed a risk of danger to the community or others because of the nature of the charged offenses, his substance abuse history and a pattern of similar criminal activity. Id. at 5. Pretrial Services recommended that Judge Dries release the defendant on the following conditions:

1.  The defendant shall report to Pretrial Services as directed.

2.  Refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. 802, unless prescribed by a licensed medical practitioner.

3.  The defendant is to participate in urinalysis and, if deemed appropriate by the Pretrial Services Officer, the defendant shall also participate in residential or outpatient drug treatment. The defendant shall pay the cost of this program as directed by Pretrial Services.

4.  The defendant is not to possess any firearms or other dangerous weapons.

5.  Comply with requirements to obtain and maintain employment.

6.  The defendant is ordered to have no contact with co-defendants, witnesses or victims.

6

7.     The defendant shall participate in the Location Monitoring Program utilizing (radio frequency (RF) monitoring and shall abide by all technology requirements. The defendant shall be restricted to his residence every day from 9:00 p.m. to 6:00 a.m., or as directed by the officer (Curfew) The defendant shall follow all program rules and pay all or part of the costs of participation in the location monitoring program as directed by the Court and/or the officer.

Id. at 5-6.

On February 12, 2024, Judge Dries presided over the detention hearing, at which the government sought detention.[1] Dkt. No. 38. The government argued that the defendant faced two presumptions of detention—one based on the amount of drugs alleged and one based on firearms. Id. at 1. It argued that the defendant was aware of the arrests of defendants in related DTOs, as well as the homicide of Rodriguez-Perez, but was not deterred from participating in criminal conduct. Id. It described the two controlled buys of fentanyl, social media posts showing that the defendant had been involved in distribution of numerous kilograms of controlled substances, photos on social media showing the defendant with much more money than the $1,600 per month he reported making. Id. The government argued that the defendant was affiliated with the "3278" gang, referencing the pendent found in the search of his residence. Id. The government described the items recovered in the search of the defendant's residence, including the drugs and the guns, and emphasized that because he had a felony conviction, the defendant could not possess firearms. Id. The government told Judge Dries that although he was unemployed, the defendant ran a cell phone store and recently had purchased a bar on North Avenue; both businesses were in the defendant's girlfriend's name, and the government

_____

[1] There is no transcript of the detention hearing, but the court reviewed the minute order from the hearing.

represented that the defendant was being investigated for money laundering and hiding assets. Id.

The government provided more details of the defendant's criminal history than were reflected in the bond study. It described more than one incident in which the defendant fled police after being involved in criminal activity, a robbery during which women and children were put in a closet and a child was held at gunpoint, an incident where the defendant was alleged to have shot someone in the leg and was found hiding with Franklin and drugs. Id. The government argued that police activity reflected that although the defendant had not had any recent arrests, his criminal activity had been ongoing. Id.

The defendant asserted that he'd not been in trouble with the law for ten years and that much of the government's argument boiled down to issues about the people with whom he associated (some of whom were his family). Id. He said that he could not refute the government's assertions about his criminal history because no records of those events had been provided to defense counsel. Id. He argued that one of his arrests was made by an officer who later was arrested and charged with corruption, and that he'd been taken advantage of. Id. Defense counsel said that when he'd asked the defendant what had motivated him to stay out of trouble for the past ten years, the defendant had responded that it was his children; the defendant did not want to be away from his children and said that the mother of one of his children had died by gun violence. Id. at 3. The defendant argued that he had a lot of support, a lot of family in Milwaukee (including his children) and no history of violence. Id. He also asserted that when he'd been on supervision in the past, he'd followed the rules and successfully completed the supervision term. Id.

The government emphasized that just the prior week, a half-kilogram had been seized by agents, and agents had found guns, drugs and cash in the defendant's home. Id. It also asserted that there were statements made in text messages from the defendant to a co-defendant, reflecting physical violence. Id. The defense clarified that the half-kilogram was the amount found among the entire group, not this one defendant. Id.

Over the defendant's objection, Judge Dries ordered the defendant detained pending trial. Id. He observed that there was a presumption of detention and that the charge was very serious—fentanyl was very dangerous. Id. As to the strength of the evidence, Judge Dries observed that the government had a strong case, and that here there had been controlled buys, social media, large amounts of cash, a drug press and drugs. Id. He characterized the defendant's criminal history as "limited," but questioned whether it was representative of what was going on with the defendant; Judge Dries said the criminal complaint suggested that the defendant was intelligent and careful, warning his associates to "say less "Id. He speculated that the defendant's caution might suggest why he'd not been caught in recent years, when the government's evidence suggested that he had been involved in criminal activity for years. Id. Judge Dries noted the defendant's "limited" employment and the fact that law enforcement had found guns along with ammunition. Id. He concluded that there were "no factors present to rebut" the presumption of detention, and ordered the defendant detained. Id.

On February 13, 2024, the grand jury returned a thirty-two-count indictment charging the defendant and nine others with various offenses related to their alleged participation in the drug trafficking organization. Dkt. No. 42. The grand jury charged the defendant with seven counts: (1) conspiracy

9

to distribute and conspiracy of possession with the intent to distribute, in violation of 21 U.S.C. §§841(a)(1), 841(b)(1)(A), 841(b)(1)(B) and 846 (Count One); (2) use of a communication facility in furtherance of a drug trafficking offense, in violation of 21 U.S.C. §843(b) (Count Two); (3) distribution of fentanyl, in violation of 21 U.S.C. §§841(a)(1), (b)(1)(C) (Count Six); (4) distribution of fentanyl, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(C) (Count Ten); (5) possession of fentanyl and cocaine with intent to distribute, in violation of 21 U.S.C. §§841(a)(1), 841(b)(1)(B) and 841(b)(1)(C) and 18 U.S.C. §2 (Count Fourteen); (6) being a prohibited person in possession of firearms, in violation of 18 U.S.C. §§922(g)(1) and 924(a)(8) (Count Fifteen); and (7) knowingly possessing a firearm in furtherance of the drug trafficking offenses charged in Counts One and Fourteen, in violation of 18 U.S.C. §§924(c)(1)(A)(i) and (2)(a). Dkt. No. 42.

Notably, one of the other individuals charged in the indictment is Brianna Madden, the defendant's girlfriend and the person with whom he proposed to live if Judge Dries had ordered him released. Madden is charged in the primary drug conspiracy count (Count One), in one of the substantive drug counts (with the defendant) (Count Fourteen), in the §924(c) count (with the defendant) (Count Sixteen) and with being a keeper of a drug house (Count Thirty-Two). Id.

## II.     The Parties' Arguments

The defendant's August 20, 2024 motion for review of Judge Dries's detention order says that he can rebut the two presumptions of detention and that the government "will fall short of its burden to prove by clear and convincing evidence that [he] poses a danger to the community and that there are no combination of conditions that will reasonably assure the safety of

10

others in the community." Dkt. No. 1112 at 1. He contends that it is "unlikely" that this court would find the defendant a flight risk—he was born and raised in Milwaukee, his mother lives here and he is close to her, his siblings live here and he is close to them, he is in a relationship with Brianna Madden, he has five children here and he has no passport and never has traveled outside the United States. Id. at 2. As for danger to the community, the defendant argues that while the government spent significant time at the detention hearing talking about law enforcement contacts the defendant had had, few of those contacts resulted in charges or convictions. Id. at 2-3. The defendant reiterates that he has not had any criminal convictions for ten years, and dismisses the government's "usual" argument that this just means the defendant has not been caught. Id. at 3. The defendant emphasizes that in February 2020, he successfully discharged from supervision in his 2013 felony case, and characterized his criminal history as "limited" and "dated." Id.

The defendant asserts that even though firearms were recovered from the residence during the February 7, 2024 search, "none of the informants in this case claimed that [the defendant] was known to be armed." Id. He argues that he was under heavy surveillance by law enforcement, none of whom observed him with a gun, and he has not been accused of committing any acts of violence during the investigation. Id. And, he says, the amount of fentanyl that can be directly attributed to him is insufficient to trigger the mandatory minimum penalty. Id. The defendant says that he has met his light burden of production to rebut the presumption of dangerousness. Id.

Defense counsel reports that he has yet to encounter a case where the government didn't characterize a group of drug dealers as "sophisticated," "large-scale" and a "DTO." Id. at 3-4. But, he says, evidence that the defendant

11

was a "kingpin" of such an operation is thin relative to "most" federal drug conspiracies. Id. at 4. He says that the government relies heavily on telephone contacts between the alleged members of the DTO, but argues that this reliance ignores the fact that the defendant is related to co-defendants Wilder, Winston and Bruce, is friends with other co-defendants and is in a relationship with co-defendant Madden. Id. He asserts that while the discovery shows communications about *drugs*, it does *not* show communications about the drugs charged in the indictment (fentanyl, cocaine). Id. The defendant says that the extraction from his cell phone shows unknown numbers texting him; sometimes he responds, sometimes he does not, and the photos of suspected narcotics are being sent *to* the defendant, not from him. Id. He argues that the government has not yet demonstrated that any of the communications ever resulted in a drug deal. Id. Although the government had the defendant and his co-defendants under surveillance for months, the defendant says that the discovery thus far shows no evidence that he met with members of the conspiracy to engage in drug transactions or was observed at stash houses or had enforcers. Id. at 5.

As to the weight of the evidence, the defendant argues that as to the first controlled buy of fentanyl, the purchasing undercover agent admitted that he could not see the defendant's face. Id. He says that the undercover agent purported to identify him by tattoos the agent observed during the transaction, which he compared with tattoos on the defendant's social media posts. Id. The defendant points out that the discovery does not identify the tattoos or the specific social media posts and does not reveal whether the agent viewed a photo array or simply a photo of the defendant. Id. And the defendant questions the reliability of law enforcement's identification of him as the person

12

with whom the agent spoke in setting up the transaction. Id. at 5-6. As for the second controlled buy, the defendant recounts that a car rented by Brianna Madden was used to drive to the transaction and that the undercover agent was able to see the defendant's face; the defendant provided the agent with fourteen grams of fentanyl. Id. at 6.

The defendant rebuffs the government's argument that a shared phone line used for making drug deals evidences a conspiracy; he asserts that small-time drug dealers commonly pass around a shared phone and sell to the same customers. Id. He says the shared phone line "suggests a handful of low-level guys making isolated street-level transactions," and he questions why, if he was the leader of a sophisticated DTO, he was showing up to do street-level deals himself. Id.

As for the items recovered from the search of the residence in which the defendant and Madden were located on February 7, the defendant reports that although the government told Judge Dries that law enforcement had recovered fifty-three grams of fentanyl and fifteen grams of cocaine from the residence, lab reports revealed that over twenty grams of the suspected fentanyl tested negative for controlled substances. Id. at 7. The defendant contends that Count Fourteen—which charges him with possessing forty grams or more of fentanyl on February 7, 2024—is no longer supported by the evidence, and that even adding the 4.98 grams of fentanyl from the first controlled buy and the 13.7 grams from the second to the amount found in the residence, the total amount of fentanyl attributed to the defendant is about thirty-nine and a half grams. Id. That is less than the forty grams charged in Count Fourteen, and (the defendant argues) insufficient to trigger the five-year mandatory minimum mandated by 21 U.S.C. §841(b)(1)(B)(vi).

13

The defendant argues that the weapons found in the residence were not out in the open or within the defendant's reach, and no one saw him try to retrieve one; he says the rifle was unloaded. Id. He reiterates that during an investigation that lasted a year and a half, no law enforcement observed him in possession of a weapon and no informants reported that he was known to be armed. Id. at 8. In sum, the defendant argues that the evidence the government has presented "tends to show that [he] is a low-level independent actor rather than the head of a sophisticated drug operation," and shows that he is not a danger to the community. Id.

Turning to his own history and characteristics, the defendant repeats his ties to the community, his limited and dated criminal history and the fact that he has no convictions from the last ten years. Id. He concedes that he has a history of drug use, explaining that in July 2021, Diamond Arburry—only twenty-four at the time—was shot and killed in the crossfire of a gunfight outside a nightclub; Arburry was the mother of one of the defendant's daughters. Id. The defendant's daughter with Arburry is now six, lives with her grandmother and misses her father. Id. at 9. The defendant says that he is drug-free, is thinking clearly and has suffered from being separated from his daughter and his other children; he says his time in custody has convinced him that he needs outpatient treatment and gainful employment. Id. Acknowledging that the court might be concerned that the defendant's drug use could lure him back into criminal activity, the defendant asserts that he will be starting clean, has been honest about his drug use with pretrial services and realizes that he needs treatment. Id.

The defendant maintains that the government has not shown by clear and convincing evidence that he poses a danger to any person or the

14

community if released. Id. He emphasizes that the court must analyze the risk he poses in the future, rather than the riskiness of the offenses he is alleged to have committed in the past. Id. at 10. He reiterates that over the course of an investigation that lasted a year and a half, he is alleged to have engaged in two controlled buys, one of which involved a questionable identification of him as the seller. Id. He recounts that at the detention hearing, the government emphasized that the defendant told other people to "say less" some nine times; he concedes that it is understandable that Judge Dries would have understood this to mean that the defendant was telling the person on the other end of the line to avoid discussing illegal activity. Id. The defendant says, however, that "say less" is slang for, "I get it" or "I understand," describing it as a common form of active listening rather than anything covert or nefarious. Id. at 10-11.

As for conditions of release, the defendant says that his aunt, Melinda Johnson, is willing to post a property bond—a property valued at $186,000 that she owns free and clear. Id. at 11. He asks the court to revoke the order of detention and release him on the conditions proposed in his bond study. Id. at 12.

The government begins with the presumptions, asserting that the defendant is subject to the presumption imposed by 18 U.S.C. §3142(e)(3)(A) (which imposes a presumption of detention when a judicial officer finds there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act) and the presumption imposed by 18 U.S.C. §3142(e)(3)(B) (which imposes a presumption of detention when a judicial officer finds that there is probable cause to be believe that the person committed an offense under 18 U.S.C. §924(c)). Dkt. No. 114 at 13. The

15

government asserts that the defendant is required to present evidence to rebut these presumptions, and that that evidence must distinguish him from drug dealers as a group. Id. at 13-14. It reminds the court that even if the defendant presents evidence that rebuts the presumptions, the presumptions remain in the case as evidence weighing against release. Id. at 14.

The government then turns to the familiar 18 U.S.C. §3142(g) factors— the nature and circumstances of the offenses, the weight of the evidence against the defendant, the history and characteristics of the defendant and the nature and seriousness of the danger that would be posed by his release. Id. The government argues that the nature and circumstances of the offenses are aggravated, involving both fentanyl and firearms, and that that aggravated nature is evidenced by the fact that Count One (the conspiracy charge) carries a mandatory minimum sentence of either five or ten years, depending on the amount of the drugs, and Count Sixteen (the §924(c) charge) carries a mandatory minimum of five years that the court must impose to run concurrently with any other sentence. Id. (The government concedes that the amount of fentanyl seized at the defendant's residence no longer suffices to trigger the mandatory minimum, given the lab results. Id. at 14 n.6.) It asserts that the defendant was not engaging in isolated, street level transactions, insisting that he was the "leader of the sophisticated, large scale drug operation." Id. at 15. It maintains that the defendant used his own family—the people most loyal to him—to engage in drug trafficking, and that he obtained kilogram amounts of fentanyl, heroin, cocaine and methamphetamine to supply the members of the DTO. Id. The government argues that the organization as a whole sold heroin mixed with fentanyl—a lethal

16

combination—and that the defendant shared with his associates concerns about people cooperating with the police. Id.

Not surprisingly, the government disagrees with the defendant that he only communicated with others about drug dealing, without actually engaging in drug dealing. Id. It points to the controlled buys, the information from the cooperating individuals and the contraband found in the defendant's residence as evidence of the fact that he *was* engaged in drug dealing, and wasn't just talking about it. Id. And, the government emphasizes, the defendant was engaged in drug dealing while possessing firearms, despite being a prohibited person. Id. The government says that one of the firearms had had the serial number removed. Id. And it says that evidence extracted from the defendant's cell phone showed that the defendant had "been around firearms since at least May 2022." Id. at 16. The government points out that the defendant had every reason to know the danger posed by the combination of drugs and firearms, given his awareness of Rodriguez-Perez's murder. Id.

The government emphasizes that in the investigations preceding the one that led to the defendant's arrest, people the defendant knew or associated with in the drug trade were federally indicted or charged in state court, and that his cell phone and jail call records show as much. Id. Yet, the government argues, he did not cease his illegal activity; the government says the information extracted from the defendant's phone shows that he continued his drug activity "without missing a beat." Id.

Turning to the weight of the evidence, the government says that its evidence has gained strength since the detention hearing. Id. In response to the defendant's argument that in the first controlled buy, the undercover agent's identification of him was questionable at best, the government says "the

17

recordings are unwavering in showing the defendant was present for the controlled buys." Id. While conceding that the amount of fentanyl found in the defendant's home on February 7, 2024 is not sufficient to trigger the mandatory minimum, the government argues that that fact "does not change the overwhelming evidence that the defendant was a multiple kilogram heroin, cocaine, and fentanyl and pound methamphetamines dealer." Id. It says that the fact remains that the defendant had loaded firearms in his residence, easily accessible, along with drugs and over $80,000. Id. at 16-17.

The government characterizes the defendant's criminal conduct as ongoing since he was fourteen, with a repeated history of being unsuccessful on supervision. Id. at 17. It vehemently disagrees with the defendant's assertion that he has had no criminal convictions for the past ten years and that he has been law-abiding since his release from incarceration, asserting that "[t]he fact is the defendant's criminal history demonstrates numerous times he failed to comply with conditions of supervision since his release from prison in April 2016," maintaining that he was re-incarcerated six times while on supervision. Id. The government insists that the defendant simply has been sophisticated enough not to get caught, and maintains that the evidence shows that he had been distributing dangerous drugs since at least 2020 (without being arrested). Id. It says a factor that allowed the defendant to be successful in drug trafficking was through the support of his family, pointing out that both his family members and his girlfriend have been indicted as co-defendants. Id. The government asserts that family support did not deter the defendant from engaging in criminal conduct before his arrest, and it is unlikely to do so after. Id. at 17-18. And the government reiterates that the

18

defendant continued his criminal conduct despite knowing that other acquaintances and associates had been indicted or charged. Id. at 18.

The government asserts that the danger the defendant poses to the community if released is that he will continue to engage in drug trafficking. Id. It points to district court precedent holding that "danger to the community" is broader than danger of harm involving physical violence. Id. (citing United States v. Dominguez, 629 F. Supp. 701, 707 (N.D. Ind. 1986). It maintains that the members of the DTO have demonstrated that the organization can continue functioning while individual members await trial, and reminds the court that at least one of the indicted co-conspirators has yet to be apprehended. Id. at 19. And, the government says, law enforcement has not yet been ablet to determine the source of the guns in the defendant's residence. Id.

Finally, the government argues that the only time the defendant has not posed a danger to the community is when he has been in custody. Id. at 20. It asserts that no conditions or amount of bail or property will reduce the risk he poses to the community. Id.[2]

**III.    Analysis**

 A. Standard of Review

Under 18 U.S.C. §3145(b), a defendant may move for the district court to review a magistrate judge's release or detention order. The district court must conduct a *de novo* review and need not defer to the magistrate judge's findings. United States v. Wilks, 15 F.4th 842, 847 (7th Cir. 2021); see also United States v. Cross, Case No. 20-cr-9, 2020 WL 1139841, at *1 (E.D. Wis. March 9, 2020). The district court's review of a magistrate judge's detention order may

---

[2] The government does not assert that the §3142(g) factors demonstrate that the defendant is a flight risk, only that the defendant is a danger to the community. Dkt. No. 114 at 13 n.5.

be conducted either by reviewing the transcript or by holding a new hearing. United States v. Torres, 929 F.2d 291, 292 (7th Cir. 1991). Although the district court has the authority to conduct a new hearing, it is not required. See 18 U.S.C. §3142(f).

B.    Burden of Proof

Under the Bail Reform Act of 1984, a defendant shall not be detained pre-trial unless the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §3142(e). The government bears the burden of proving flight risk by a preponderance of the evidence. Portes, 786 F.2d at 765. The government bears the burden of proving danger to others or the community by clear and convincing evidence. United States v. Salerno, 481 U.S. 739, 751 (1987). A finding of either flight risk or danger to the community is sufficient to detain a defendant awaiting trial; under the Act, a court need not find both to detain a defendant. United States v. Daniels, 772 F.2d 382, 383 (7th Cir. 1985). In determining whether a defendant is a risk of flight and/or a danger to the community, the court must consider (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves narcotics; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. §3142(g).

C.    Section 3142(e) Presumptions

Under the Bail Reform Act, if the judicial officer finds that there is probable cause to believe that the defendant committed one or more of a select list of offenses, there arises a rebuttable presumption that no condition or

20

conditions will reasonably assure the appearance of the defendant and/or the safety of the community. 18 U.S.C. §3142(e)(3). Among these offenses are an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§801 et seq.) and an offense under 18 U.S.C. §924(c). 18 U.S.C. §3142(e)(3)(A), (B). Because the charge in Count One—the drug conspiracy charge—carries a possible maximum life sentence and Count 16 charges the defendant and Madden with a violation of 18 U.S.C.§924(c), dkt. no. 42 at 1-2, 20, the defendant faces two presumptions of detention.

The presumption "places a light burden of production on the defendant," Wilks, 15 F.4th at 846-47, and that burden is "not a heavy one to meet," Dominguez, 783 F.2d at 707. "Any evidence favorable to a defendant that comes within a category listed in §3142(g) can affect the operation of . . . the presumption[], including evidence of [a defendant's] marital, family and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in § 3142(g)(3)." Dominguez, 783 F.2d at 707. "[T]he burden of persuasion always rests with the government and an unrebutted presumption is not, by itself, an adequate reason to order detention." Wilks, 15 F.4th at 846-47. Even if the presumption is "rebutted," however, it "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." Dominguez, 783 F.2d at 707; see also Wilks, 15 F.4th at 847 (stating that "the presumption is considered together with the factors listed in § 3142(g)").

On de novo review, this court concludes that the defendant has met his "light burden of production" and rebutted the presumptions. As to risk of flight,

the evidence shows that the defendant was born in Milwaukee and, at approximately age thirty, has lived there his entire life. Dkt. No. 19 at 1. The defendant's mother, girlfriend, four siblings and five children all live in Milwaukee. Id. The defendant reports that he is close with his mother and siblings and has a good relationship with his five children. Dkt. No. 112 at 2. He does not have a passport and never has traveled outside the U.S. Dkt. No. 19 at 2. The defendant's limited employment history seems to consist of work helping at his family's store, which presumably is in Milwaukee. Id. This evidence demonstrates the defendant has significant ties to the community and is sufficient to meet the "light burden of production." Thus, the defendant has rebutted the presumption that he is a flight risk.

The defendant also has met the light burden of production rebutting the presumption that he is a danger to the community. Again, he needs only to produce *some* evidence relating to one of the §3142(g) factors. To the extent that it is reflected in the bond study, Judge Dries accurately described the defendant's criminal record as "limited." Dkt. No. 38 at 3. In the thirteen years since he was seventeen, the defendant has had three convictions—one for felony possession of marijuana with intent to deliver for which he received a sentence of ten days, one for misdemeanor possession of an illegally obtained prescription, for which he was sentence to probation with five months imposed and stayed and one for felony manufacturing/delivering heroin and possession of heroin with intent to deliver, for which he received a sentence of three years. Dkt. No. 19 at 4-5. None of these three convictions occurred within the last ten years. Id. None of the convictions involved violent offenses. Almost nine years separate his last conviction—on September 24, 2014—and the controlled buys described by the government, which took place on June 27, 2023 (dkt. no. 2 at

22

24) and September 13, 2023 (dkt. no. 2 at 30). This evidence is enough to overcome the "light burden of production" necessary to rebut the presumption he is a danger to the community.

Although the court concludes that the defendant has met his light burden of production to rebut the presumptions, the presumptions still "remain[] in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in §3142(g)." Dominguez, 783 F.2d at 707; see also Wilks, 15 F.4th at 847 (stating that "the presumption is considered together with the factors listed in § 3142(g)").

D.    Section 3142(g) Factors

Because the government has not argued that the defendant is a flight risk and it is the government's burden to prove that he is, the court will not evaluate whether the §3142(g) factors support detaining the defendant based on risk of flight. The court considers only whether the §3142(g) factors support detaining the defendant based on danger to the community. See Daniels, 772 F.2d at 383 (holding that a finding of either flight risk or danger to the community is sufficient to detain a defendant awaiting trial).

1.    *The Nature and Circumstances of the Offense Charged*

The Seventh Circuit has cautioned that courts "must be careful, in drug offenses, to discriminate between isolated or street level transactions and major drug distribution schemes," because "[t]he level of the danger to the community increases proportionately with the increase in the sophistication, nature, size, and extent of the drug operation." Dominguez, 629 F. Supp. at 710. Considering that caution, the court acknowledges that the limited evidence proffered by the government does not describe the DTO as the most sophisticated drug operation this court has seen. But the evidence relating

23

solely to the defendant implies a major drug-distribution scheme, not an isolated or street-level transaction.

The government explains that in April 2023, members of Azjuan Meriwether's drug-trafficking organization (which, the government asserts, had included Dontrell Franklin and Daniel Rodriguez-Perez) were federally indicted,[3] and Franklin was charged with murdering Rodriguez-Perez.[4] Dkt. No. 114 at 2. Then, on April 18, 2023, Cliffton Spencer and members of his drug trafficking organization were indicted federally[5]; the government says case agents learned that sometimes Spencer was "being sourced" by members of Meriwether's organization. Id. Agents continued to investigation connections between the two organizations and found a phone number associated with the defendant in this case that had been in "frequent contact" with members of Meriwether's group and with Spencer. Id. at 2. Information extracted from

---

[3] On April 11, 2023, the grand jury in the Eastern District of Wisconsin returned a thirty-one-count indictment against ten defendants: Azjuan Meriwether, Dontrell Franklin, Tasha Brown, Savanna Williams, Laron King, Jaiden Henning, Brandon Nichols, Jacob Flowers, Trennell Henning and Shannone Brown. United States v. Meriwether, et al., Case No. 23-cr-69. The presiding judge is Judge Lynn Adelman. The charges include drug trafficking and firearms trafficking. One defendant has pled guilty; it appears there is no trial date.

[4] Franklin was charged in Milwaukee County Circuit Court on April 19, 2023 with misdemeanor disorderly conduct (party to a crime, use of a dangerous weapon), first-degree reckless homicide (party to a crime, use of a dangerous weapon) and sale/possession/use/transport of machine guns. State v. Franklin, Case No. 2023CF001706 (Milwaukee County Circuit Court), available at https://wcca.wicourts.gov. A plea hearing is scheduled for September 4, 2024.

[5] The grand jury in the Eastern District indicted Cliffton Spencer, Keyyokie Johnson and Malik Howard with controlled substance and gun charges. United States v. Spencer, et al., Case No. 23-cr-72. Judge Stadtmueller presides over that case. All three defendants have pled guilty; Johnson and Howard have been sentenced and Spencer awaits sentencing.

Rodriguez-Perez's cell phone had a contact for the defendant, and there were over ninety calls between the defendant's number and Rodriguez-Perez's number in the month between February and March 2023. Id. At that point, agents had circumstantial evidence that a couple of months prior to the Meriwether, Franklin and Spencer indictments, the defendant had been associating with members of those groups.

The government has alleged that four confidential informants or sources provided information that the defendant was obtaining drugs from Rodriguez-Perez in late 2022, that the defendant and Franklin sold controlled substances to each other, that the defendant had supplied Franklin with heroin and cocaine until Franklin met Rodriguez-Perez and began selling heroin, fentanyl, cocaine and methamphetamine to the defendant, that in the fall of 2022 the defendant began to deal directly with "Mexicans" to obtain drugs and that the defendant allowed co-defendants Winston, Bruce and Wilder to use his "drug phones. Agents also learned in March 2023 that the defendant's phone had been in contact with the phone of a trafficker named "Loco" over 100 times in February and March 2023.

All of this is what caused law enforcement to turn their attention to the defendant and his associates. All of it is circumstantial evidence that the defendant was involved in more than street-level drug transactions. In the year and a half between July 2022 and December 2023, confidential sources (two of them) and undercover agents purchased significant amounts of heroin, methamphetamine and cocaine from various of the co-defendants in this case. Agents observed that most of the people making these purchases were the defendant's relatives or loved ones. While, as the court has said, this may not have been the most sophisticated of drug operations, the agents observed more

than "a handful of low-level guys making isolated street-level transactions," as the defendant argues.

The defendant argues that the government overreaches when it argues that he was the "kingpin" of a large-scale drug organization. He says that if he was such a big player, he wouldn't have been showing up to do controlled buys himself, and argues that of course there are many contacts between himself and co-defendants because they were his family and friends. He may be correct that the government will not be able to prove that he is a "kingpin." The defendant may not have been "running" the drug trafficking enterprise in the way one might imagine someone running a network of individuals operating in several states or countries, with participants who do not know each other playing various roles. But the government does not have to prove that the defendant was a "kingpin" to prove that he is a danger to the community. It needs only to show, by clear and convincing evidence, that the defendant was part of an extensive drug scheme. Here, the evidence from phone records and informants shows just that. Rodriguez-Perez and Spencer were not members of the defendant's family. And the confidential informants did not describe the defendant going to family picnics with Rodriguez-Perez, Franklin and Spencer, or taking vacations with them. They described him buying drugs from, or selling drugs to, them.

The defendant argues that at the June 27, 2023 controlled buy of fentanyl, the undercover agent didn't see the defendant's face and identified him only by comparing the tattoos of the person who sold him the drug with tattoos on the defendant's social media posts; he asserts that the identification was unreliable. That may prove to be true, but there was another controlled buy three months later in which the agent did see the defendant's face. More to

26

the point, when the agents executed the February 7, 2024 search, they found a variety of drugs (fentanyl, heroin, cocaine, methamphetamine and crack), guns, ammunition, cash, cell phones, scales and blenders, lactose, baggies, a pill press—and the defendant and Madden. This was not the stash of a "low-level guy" who makes isolated street transactions. The defendant maintains that once the fentanyl found in the residence was sent to the lab, it turned out that there was less of it than the government originally thought (and less than the amount necessary to trigger the mandatory minimum). The government does not dispute this, but it matters little. The amount of fentanyl found in the defendant's residence wasn't a user amount, or a few doses.

The guns and ammunition found in the defendant's residence ratchet up the seriousness of the offense. The defendant asserts that the rifle wasn't loaded and that neither weapon was out in the open or in arm's length. The court isn't sure what that means; arm's length depends on where one's arm is at the time. The government does not allege—thankfully—that the defendant drew a weapon on law enforcement when they appeared. But the facts remains that the defendant—a prohibited person who could not lawfully possess firearms or ammunition—had both, in a residence with a variety of drugs and indicia of large-scale drug dealing.

The nature and circumstances of the charged offenses are serious.

### 2. *The Weight of the Evidence Against the Person*

The defendant argues that the government's "primary" evidence against the defendant comes from the two controlled buys and the items found in his residence. But that ignores the historical evidence provided by the defendant's phone connections with Rodriguez-Perez and Spencer and the recounts (corroborative) of the confidential informants. Of course the value of

27

information provided by confidential sources depends on the reliability and credibility of the source and verification of the information provided, and at this early stage, the defendant has no way to attack reliability or credibility because he does not know who these sources were. But the information provided by the sources is, nonetheless, evidence and it sheds a different light on the controlled buys and the items recovered from the defendant's residence. And, combined with the evidence of the controlled buys and the evidence found in the defendant's residence on February 7, 2024, it provides a basis for the conspiracy charge in Count One.

The defendant questions whether the government will be able to prove that he was the person who conducted the June 2023 controlled buy. For the sake of this decision, the court will assume that the identity evidence for that transaction (which is the basis for Count Six) is shaky. But the defendant himself admits that the undercover agent who made the controlled buy in September 2023 (the basis for Count Ten) saw the defendant's face. The evidence regarding that charge is strong.

The defendant and Madden both were present in the residence during the search on February 7, 2024, along with the fentanyl and cocaine charged in Count Fourteen. The defendant is a prohibited person, so he was prohibited from possessing, owning or controlling the guns and ammunition found in the residence. And his presence, and Madden's, in the house with drugs *and* guns supports the §924(c) charge in Count Sixteen.

Does all this evidence prove beyond a reasonable doubt that the defendant committed the crimes charged? It does not. But that is not the government's burden in arguing for detention. The government's burden at the detention stage, when it comes to proving that the defendant is a danger to the

28

community, is clear and convincing. The evidence the government has identified meets that burden.

3.   *The History and Characteristics of the Person*

A lot of the defendant's history is more relevant to an evaluation of flight risk than dangerousness, but some of it has bearing on the dangerousness analysis.

Based on what the defendant told Pretrial Services and what he stated in his briefing, the defendant appears to have strong family and community ties. In this case, however, that fact cuts both ways. The grand jury found probable cause to believe that the defendant was engaged in drug trafficking with members of his family *and* his girlfriend with whom he lived—Brianna Madden. Having a supportive family and significant other not only failed to deter the defendant from engaging in the charged conduct—it appears to have *assisted* him in engaging in the charged conduct.

The defendant's criminal history is difficult to pin down. As the court explained, Judge Dries found it "limited," and if one looks only at the bond study, one must agree. The defendant's most serious conviction is his 2014 conviction for manufacturing/possessing with intent to deliver heroin, for which he received a sentence of three years. While the government alleges that the defendant has a history of engaging in violent conduct, that history is not reflected in the bond study, or in his conviction record. The government also alleges that the defendant has "historically demonstrated multiple times he cannot comply with conditions of supervision," dkt. no. 114 at 10, but that is not reflected in the bond study.

The government recounts facts that presumably come from police reports relating to some of the arrests that did not result in charges. For example, it

29

describes an incident in October 2012 when the defendant allegedly committed an act of physical violence on his then-pregnant girlfriend, then tried to run. Id. at 10. Presumably these facts relate to the defendant's October 13, 2012 arrest at age eighteen for battery and resisting/obstructing, but there was no prosecution. See Dkt. No. 19 at 4. The government says that on January 7, 2013, four suspects approached a woman when she arrived home and told her that "Janet" had sent them to get "Loco's" money. She said that the four forced her and her children into the residence, threatened to kill her, ransacked the bedroom and took cash and two cell phones. The woman later told officers she believed the defendant was involved because she recognized his voice; when arrested, the defendant denied being involved in the robbery. Dkt. No. 114 at 11. Presumably these are the facts that led to the defendant's March 11, 2013 charges for felony armed robbery, felony burglary of a dwelling and misdemeanor failure to support, but the armed robbery charge was not prosecuted and the probation office could find no disposition for the burglary charge. Dkt. No. 19 at 4.

The bond study *does* show that the defendant was released to state extended supervision on April 26, 2016, and that on December 26, 2017— twenty months later—the defendant was arrested for felony probation violations of supervision and turned over to the parole/probation authorities. Id. at 5. The government, however, says that the defendant was taken back into custody only a month after his release—on May 17, 2016—and that he "would return to custody five more times over the next two years for supervision violations" that occurred in December 2016, March 2017, December 2017, June 2018 and July 2018. Dkt. No. 114 at 12. The government maintains that this shows that the defendant—contrary to his assertions—did not

30

"successfully" complete supervision, and maintains that the evidence shows that upon completing his supervision, he quickly "returned" to drug trafficking.

The government undoubtedly has access to information that the court does not, and perhaps that pretrial services was unable to obtain in the brief two days it had between the defendant's arrest on February 7, 2024 and the February 9, 2024 bond study. But it is difficult to know what to make of allegations that did not result in charges. Perhaps victims chose not to press charges or failed to appear, as often happens in cases involving domestic violence. Perhaps there were other proof problems. All the court can tell for sure is that the defendant went to prison for drug dealing, was released and then picked up on a felony probation violation and allegedly was involved in drug dealing again two years after his supervision terminated. Those facts, in themselves, relate to dangerousness—they show that getting sent to prison for drug dealing did not appear to deter the defendant from drug dealing activity, and that his conduct may have escalated in this case with the addition of possession of firearms.

Also concerning is the fact that, at age thirty, the defendant appears to have little work history and relies on his family (through their allowing him to help out at their store), selling things online and his girlfriend for financial support. He has a history of drug use; he must have obtained money to purchase those drugs somehow. The government asserts that the defendant owns a phone store and has recently purchased a bar, and questions where the money would come from for the defendant to make those purchases. Combined with the evidence the court has discussed, there is a strong indication that the defendant has been supporting himself through drug trafficking.

31

The defendant's history of drug use is also concerning in terms of dangerousness. The defendant reported beginning his substance use at age fourteen, using THC daily and heroin weekly (although presumably not for the entire period between ages fourteen and thirty). At some point, he also was using prescription opioids. Drug use lowers inhibitions and affects judgment, and again, the money to buy those drugs must come from somewhere if the defendant does not have significant, verifiable employment.

The defendant argues that he has a good reason for retreating to drug use—in the summer of 2021, the mother of his young daughter was shot outside a nightclub when a fight broke out and she was caught in the crossfire. But the defendant's assertion implies that he did not start using drugs until this tragic event occurred. The court has no evidence to that effect, and the defendant himself told probation that his drug use dated back to age fourteen.

The defendant says that after being incarcerated for almost seven months (since February 2024), he has had time to clear his head, get sober and think about his young daughter. He says he wants to obtain outpatient drug treatment and find gainful employment. He points out that he was honest with pretrial services about his drug use and that he now realizes he needs treatment to maintain sobriety. The court agrees with the defendant that these facts weigh against a finding of dangerousness.

The defendant's history and characteristics are a mixed bag, but in most aspects, it weighs in favor of a finding of dangerousness.

        4.     *Nature and Seriousness of the Danger to Any Person or the Community That Would be Posed by the Person's Release*

This factor requires the court to determine whether the government has proved that the defendant poses a danger to any person or the community if released. The court must consider the risk that the defendant "poses to the

32

community in the future, not simply the riskiness of his alleged offense."
United States v. Lewis, Case No. 23-3127, 2023 WL 4351244, at *1 (7th Cir.
July 5, 2023) (citing Dominguez, 783 F.2d at 706-07).

The defendant focuses on the fact that he is not alleged to have engaged
in violent conduct in this case, that so far no evidence has surfaced that he
used or carried weapons, that no informants have described him as going
armed and that not one has alleged that he engaged others to commit violent
acts on his behalf. But as the government points out, the Seventh Circuit has
said that "[a] defendant can hardly be expected . . . to demonstrate that
narcotics trafficking is not dangerous to the community." Dominguez, 783 F.2d
at 706. The court has observed that in creating the rebuttable presumption of
detention in cases involving drug trafficking offenses carrying maximums of ten
year or more, "Congress determined that [large-scale drug trafficking] is a
serious danger to the community." United States v. Portes, 786 F.2d 758, 765
(7th Cir. 1985). A defendant does not have to be physically violent, or go
around carrying and using firearms, to present a danger to the community.

As the court detailed above, the nature and circumstances of the
defendant's charged offenses demonstrate that the defendant poses a risk to
the community. The defendant allegedly participated in an organization that
trafficked deadly drugs (fentanyl, meth and cocaine) and possessed firearms
(like those found at the defendant's residence) to further its drug trafficking,
and that it did so over an eighteen-month period. The government's description
of the lethal nature of fentanyl, and the impact it has had on the Milwaukee
community, is undisputed. The presence of firearms in furtherance of drug
trafficking creates an increased risk of dangerous, as evidenced by the fact that
such an offense carries a presumption of detention. These factors relate to the

33

dangers the defendant posed when he was engaged in the alleged offenses. The question is whether there is evidence showing the likelihood of the defendant engaging in similar dangerous conduct in the future.

The court already has observed that the evidence implies that the defendant may have been supporting himself financially by engaging in drug trafficking. He has a history of heroin and opioid use. He now faces federal charges, one of which carries a mandatory minimum penalty—a stressful circumstance for someone without full-time employment and with a substance abuse history. The government has discussed the fact that the defendant was in contact with Meriwether's associates—Franklin and Rodriguez-Perez—and with Spencer. Those individuals were federally charged and arrested (and Franklin was also charged in state court). Yet the defendant appears to have continued to engage in drug trafficking activity. The defendant himself went to prison for three years for drug trafficking activity, yet returned to it after his release. While the dangerousness analysis is not backward-looking, the past can be prologue

Looking at all the §3142(g) factors combined (and not relying solely on any one of those factors), the court concludes that the government has proven by clear and convincing evidence that the defendant poses a danger to the community.

E.    Conditions That Will Reasonably Assure Appearance and Safety

The government must prove not only that the defendant poses a danger to the community but also that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community[.]" 18 U.S.C. §3142(e). In this case, the government spent only a few sentences

34

addressing this issue. But the court can consider the facts it has recounted above.

Pretrial Services recommended several conditions to Judge Dries—having the defendant report to Pretrial Services as directed; prohibiting him from having contact with co-defendants, witnesses or victims; prohibiting him from possessing firearms or dangerous weapons; prohibiting him from possessing unprescribed controlled substances; requiring him to participate in drug testing and treatment. The drug testing/treatment condition might reasonably address the court's concerns regarding the defendant's history of THC, heroin and opioid use. But the other conditions would not address concerns about the likelihood of his reoffending. The defendant had a felony conviction at the time he was arrested in a residence with two firearms and ammunition; it is not clear that a court order telling him not to possess firearms would reasonably assure his compliance. The same is true for a condition prohibiting him from possessing controlled substances; the testing/treatment condition might assure that he is not *using* the controlled substances but cannot ensure that he does not buy or sell them. Because it is not clear where the defendant obtained the fentanyl he sold in the controlled buy(s) or the drugs in the residence where the search warrant was executed, there is no way to know whether a no-contact provision with co-defendants, witnesses or victims will address the danger of the defendant returning to the drug trade.

The probation department recommended location monitoring and a curfew. These conditions are more relevant to assuring that a defendant will not flee than assuring that he will not engage in drug dealing, or possess guns. But even more concerning is the fact that the defendant told pretrial services at the time of the February 9, 2024 bond study that he would live "with his

35

girlfriend and her sister" if released. That girlfriend was Brianna Madden, who since has been charged as a co-defendant. The defendant has not proposed an alternative residence where he would live and submit to location monitoring, and having him live with Ms. Madden (if she is out of custody) is unacceptable given Ms. Madden's own criminal activity.

The defendant says in his motion that his aunt, Ms. Johnson, is willing to post a property she owns on Garfield Avenue that is worth $186,000 and which she owns free and clear. The defendant is lucky to have such a supportive family member. But the court does not know anything about the defendant's relationship with this aunt, and posting a property bond assumes that a defendant will care enough about the person who posts it that he will make sure he does not run the risk of having that bond forfeited. Again, the defendant has returned to drug trafficking after going to prison himself and after seeing people with whom he associated go to prison for drug trafficking. The court cannot conclude that he would forebear from returning to what he appears to know just to ensure that his aunt does not lose her home.

The defendant says that he wants to engage in drug treatment and obtain gainful employment; he says that spending the last few months in jail have convinced him of that. But the defendant has been to jail before, and to prison, and those experiences do not seem to have prompted him to obtain legal employment or to address his substance use.

The court cannot conclude that there is a condition or combination of conditions that will reasonably assure that the defendant is not a danger to the community or others if released.

## IV. Conclusion

The court **FINDS** that the defendant successfully rebutted the operative presumptions of detention. The court **CONCLUDES**, however, that the government has proved by clear and convincing evidence that the defendant poses a danger to others and the community.

The court **DENIES** the defendant's motion for review of the detention order. Dkt. No. 112.

Dated in Milwaukee, Wisconsin this 4th day of September, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**